# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-437V
TO BE PUBLISHED

| | |
|---|---|
| LAKARA ARNOLD,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: April 8, 2025 |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA,* for Petitioner.

*Felicia Langel, U.S. Department of Justice, Washington, DC,* for Respondent.

**ORDER DENYING RESPONDENT'S MOTION TO DISMISS AND SCHEDULING ORDER– SPECIAL PROCESSING UNIT[1]**

On January 8, 2021, Lakara Arnold ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to her on October 6, 2019. This case was assigned to the Special Processing Unit ("SPU").

---

[1] Because this Order contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Order will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

As set forth in more detail below, I conclude that Petitioner's injury meets the Act's "severity requirement," despite Respondent's objections. **Accordingly, Respondent's Motion to Dismiss (ECF No. 39) is DENIED.** The parties shall now discuss a reasonable settlement before expending additional Program resources.

### I.   Procedural History

Respondent determined in the spring of 2023 that this matter was not appropriate for compensation. *See* ECF No. 32. Respondent thereafter filed his Rule 4(c) Report arguing that Petitioner had not established the Vaccine Act's severity requirement – specifically, the existence of residual effects of the alleged injury for more than six months after the October 6, 2019 vaccine. Rule 4(c) Report at 6, ECF No. 33 (citing Section 11(c)(1)(D)(i)).

Following a review of the record and Respondent's arguments, I issued an Order to Show Cause, affording Petitioner an opportunity to submit any additional evidence to remedy the deficiencies in the record related to her ability to satisfy the severity requirement. ECF No. 35. In response, Petitioner filed several witness declarations, her own supplemental declaration, and other supporting documentation. ECF No. 36.

Despite such newly-filed evidence, Respondent reiterated his intention to defend this case on severity grounds and filed a Motion to Dismiss on January 26, 2024. Motion at 5-6, ECF No. 39. Petitioner thereafter filed a response (along with medical literature exhibits – ECF No. 40) arguing that she can establish the Act's threshold requirement. ECF No. 41. Respondent filed his reply in March 2024. ECF No. 42. The severity issue is thus ripe for consideration.

### II.   Applicable Legal Standard

Under the Vaccine Act, a petition for compensation must contain "supporting documentation, demonstrating that the person who suffered [a vaccine related injury] . . . suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i)[3]; *see also Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

---

[3] Section 11(c)(1)(D) presents two alternative grounds for eligibility to compensation if a petitioner does not meet the six months threshold: (ii) death from the vaccine, and (iii) inpatient hospitalization and surgical intervention. Neither alternative is alleged or implicated in this claim.

2

The burden is on the petitioner to establish, by a preponderance of the evidence, the persistence of a vaccine-caused injury for longer than six months. *Song v. Sec'y of Health & Hum. Servs.,* 31 Fed. Cl. 61, 65-66, *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994). However, dismissal is not appropriate if it appears the parties reasonably contest the length of time that petitioner has suffered from the effects of his alleged vaccine injury. *See,* e.g., *Faup v. Sec'y of Health & Hum. Servs.*, No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). A petitioner cannot establish the length or ongoing nature of an injury merely through his self-assertion.

Although Respondent styled his Motion as a motion to dismiss, I am construing it as a motion for summary judgment. The Vaccine Rules allow for a special master to decide a case on summary judgment. *See Jay v. Sec'y of Health & Hum. Servs.*, 998 F.2d 70, 82-83 (Fed. Cir. 1992); *see also* Vaccine Rule 8(d) (stating "the special master may decide a case on the basis of written submissions without conducting an evidentiary hearing. Submissions may include a motion for summary judgment, in which event the procedures set forth in RCFC 56 will apply."). Pursuant to RCFC 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). In ruling on a motion to dismiss, like ruling on a motion for summary judgment, special masters must draw every inference concerning disputed facts in favor of the nonmoving party. *See Warfle v. Sec'y of Health & Hum. Servs.*, 05-1399V, 2007 WL 760508 at *2 (Fed. Cl. Spec. Mstr. Feb. 22, 2007); *Guilliams v. Sec'y of Health & Hum. Servs.*, No. 11-716V, 2012 WL 1145003, at *9-10 (Fed. Cl. Spec. Mstr. Mar. 14, 2012); *Richard v. Sec'y of Health & Hum. Servs.*, No. 02-877V, 2010 WL 2766742, at *4-5 (Fed. Cl. Spec. Mstr. May 3, 2010).

In *Warfle,* for example, the special master considered a motion to dismiss for failure to state a claim, in which the respondent argued that the petitioner had failed to offer sufficient evidence concerning one of the requirements of § 300aa–11(c)(1)(D)(i). *Warfle,* 2007 WL 760508, at *2. The special master concluded that in evaluating that motion, he need only assess whether the petitioner could meet the Act's requirements and prevail, drawing all inferences from the available evidence in petitioner's favor. *Id.* In that case, he found that on the basis of various documents submitted, a reasonable fact-finder could conceivably rule in the petitioner's favor, so the petitioner's case survived the dismissal motion. *Id.*

More so, a special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy

3

evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, 2005 WL 6117475, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

### III. Evidence

I have reviewed the entire record, including all medical records, affidavits or declarations, and additional evidence. Only those records related to severity will be discussed herein, however, although other facts may be included as necessary.

- **Contemporaneous Medical Records.** At age 45, Petitioner received the subject flu vaccine in her left deltoid on October 6, 2019. Ex. 3 at 2. She had no history of left shoulder pain.

- On November 9, 2019 (approximately 34 days post vaccination), Petitioner saw her primary care provider ("PCP") complaining of left shoulder pain that "initially started 4 weeks ago." Ex. 8 at 9. Petitioner stated that she "[r]eceived her flu shot in that arm on Oct. 6th. Felt pain in the arm 2 hours after the shot." *Id.* She described her pain as radiating to the arm, moderate in severity, constant, dull, and aching. *Id.*

- A physical examination showed tenderness to palpation over the left rotator cuff, reduced strength, and limited range of motion ("ROM"). Ex. 8 at 9-10. Naproxen and a five-day shoulder sling were recommended, and Petitioner

4

was cleared to return to work (as a nurse) with lifting restrictions. *Id.* at 10; Ex. 15 at 9; Ex. 16 at 20.

- Petitioner followed up with her PCP on November 15, 2019. Ex. 8 at 7. She reported "no change in pain or [ROM]" and she "[r]equest[ed] more time off from work." *Id.* Petitioner received an excusal from work for five days (until November 20, 2019, when she could return with a 15-pound weight lifting restriction). *Id.*; Ex. 16 at 22. She was referred to an orthopedist and "possible" physical therapy ("PT"). Ex. 16 at 22. The treatment plan also included Naproxen and rest. *Id.*

- There is a subsequent six-month gap in the contemporaneous medical records, during which time Petitioner did not seek care for, nor complain of, shoulder-related symptoms. But she did obtain treatment for other concerns.

- For example, on April 24, 2020, Petitioner had a telemedicine visit with her PCP, at which time she complained of symptoms associated with COVID-19 (congestion, runny nose, wheezing, and fever). *See* Ex. 4 at 42-44. She did not mention shoulder pain during this visit.

- Then, on April 29, 2020, Petitioner had a telemedicine follow-up with her PCP for a non-productive cough, body aches (deemed to be a result of the doxycycline prescribed for her COVID symptoms), fatigue, and "leg pain." Ex. 4 at 45. Petitioner likewise did not complain of shoulder-related symptoms during this visit.

- One month later, on May 29, 2020 (now approximately six-and-a-half months after her last visit for shoulder pain), Petitioner followed up with her PCP for her annual wellness visit. Ex. 4 at 48. Petitioner complained of "[l]eft shoulder pain on and off with lost of [sic] 3 months worsening[;]" she had "tried some home therapy without much improvement." *Id.* at 49. An examination revealed left shoulder tenderness, decreased strength and ROM, and lymphadenopathy. *Id.* at 52. Petitioner was given rotator cuff exercises for her "acute left shoulder pain." *Id.* at 48, 53-61.

- On June 5, 2020, Petitioner had an initial PT evaluation. Ex. 5 at 6. She explained that "[o]n 10/6/19[, she] received a flu shot. Four shots [sic] later she felt a sudden pain in her left arm." *Id.* Petitioner reported that she was "currently having difficulty lifting with her arm and feels weakness. She describes it as a dull, achy pain" that "radiates from her elbow to her

5

shoulder to her thoracic spine." *Id.* She was assessed with a rotator cuff injury. *Id.* at 7.

- Petitioner saw an orthopedist for left shoulder pain on July 27, 2020. Ex. 7 at 12. She reported that this pain had "been bothering her for almost a year" and that it "may have been exacerbated after the flu shot but since then has noted significant pain with overhead motions[.]" *Id.* at 13. More so, she stated that she "received a flu shot in October 2019 and immediately had pain in the left shoulder[,]" with ice, over-the-counter anti-inflammatories, and use of a sling providing no relief. *Id.* Following a physical examination (showing positive impingement signs), Petitioner was assessed with impingement syndrome, and she received a steroid injection. *Id.* at 14-17. Petitioner received orthopedic and PT treatment for her left shoulder symptoms through the fall of 2020. *See,* e.g., Ex. 6 at 4-12; Ex. 7 at 5-12, 18. No other medical records bearing on severity have been filed.

- **Declarations.** Shortly after initiating her claim (in August 2021), Petitioner stated that between November 16, 2019, and April 23, 2020, she was a full-time registered nursing student[4] in Michigan but resided and worked in Ohio. Ex. 10 ¶ 11. As a result, her "schedule and commute were demanding." *Id.* She explained that, during this time, "although [her] left shoulder pain was still a day-to-day struggle, [she] was able to use [her] experience as a medical provider to self-treat at home" due to the restrictions caused by the COVID-19 pandemic. *Id.* She acknowledged that she did not complain of shoulder symptoms during her two telemedicine visits with her PCP in April 2020. *Id.* ¶¶ 12-13.

- After Respondent questioned severity, leading to my Order to Show Cause (ECF Nos. 33, 35), Petitioner tried to explain some of the relevant circumstances. Ex. 24. She stated that "[f]rom April 2019 through April 2020, [she] was very busy[,]" as she was enrolled in a full-time nursing program[5] in Ohio, but she worked on the weekends back home in Michigan to "make ends meet." *Id.* ¶ 6. Specifically, she worked "16 hours each day on Saturday and Sunday" and would then drive back to Ohio on Sunday nights to resume classes on Monday morning through Friday. *Id.*

---

[4] Petitioner attested that prior to obtaining her registered nurse license, she worked as a licensed practical nurse for 12 years. Ex. 10 ¶ 4.

[5] Petitioner submitted an official transcript from her nursing program – showing an enrollment date of April 9, 2019, and a graduation date of April 20, 2020. Ex. 25.

- Petitioner also addressed her November 15, 2019 visit (the last appointment prior to the gap in care) and stated that while she did receive a referral to orthopedics at that time, due to her busy school schedule out of state in Ohio, she was "unable to see an orthopedic doctor in Michigan." Ex. 24 ¶ 8. Petitioner "thought [her] shoulder/arm would recover in due course if [she] performed home exercises and stretches." *Id.* She therefore "did not think it would be necessary to attempt to find an orthopedic doctor who was willing to see [her] on weekends." *Id.*

- More so, Petitioner did not consider an orthopedic telehealth evaluation because "[i]t is [her] belief that an orthopedic doctor needs to make an examination in-person in order to properly diagnose an injury." Ex. 24 ¶ 9.

- Additionally, Petitioner acknowledged that she sought telemedicine care for her COVID-19 illness, including "bone pain in [her] leg." Ex. 24 ¶ 11. Petitioner attested that she thought this pain was "related to [her] COVID illness" and she understood that "bone pain and leg pain [we]re recognized as potential physical problems related to the COVID-19 illness." *Id.*

- Petitioner expressed that her left shoulder continued to hurt "[d]uring the period from mid-November 2019 until [she] scheduled an appointment . . . on May 29, 2020[.]" Ex. 24 ¶ 13. She also stated that her shoulder "felt worse during the three months before [her PCP] visit on May 29, 2020." *Id.*

- A coworker with whom Petitioner was also enrolled in the same nursing program attested that after November 18, 2019, she worked with Petitioner for an additional two years. Ex. 19 ¶¶ 11-12. "During that time in passing, [Petitioner] complained that she continued to have left shoulder pain and restricted [ROM]." *Id.* ¶ 12.

- Another one of Petitioner's coworkers recalled that Petitioner resigned from their mutual prior place of employment around July 2020[6] and, at that time, "still ha[d] left shoulder pain and trouble utilizing her left arm to its normal capabilities pre-vaccination." Ex. 22 ¶¶ 8-9.

- Petitioner's daughter was living with Petitioner at the time of the subject vaccination and recalled Petitioner complaining to her of pain soon after vaccination. Ex. 23 ¶¶ 6-8. Petitioner's daughter recalled that "[w]ithin

---

[6] Petitioner submitted a copy of her notice of resignation, showing an effective date of June 6, 2020. Ex. 26.

7

approximately two months" after the pain began, she helped Petitioner perform her at-home exercises. *Id.* ¶ 8. Petitioner's daughter lived with Petitioner until May 2021, and while there, she "repeatedly helped [] with tasks" that were difficult for Petitioner, including dressing, reaching for dishes, and other chores. *Id.* ¶¶ 10-11. No other declaration evidence has been submitted.

IV.   **Severity Analysis**

There appears to be no dispute here that Petitioner received the subject flu vaccine on October 6, 2019, and she must therefore show that her alleged injuries lasted more than six months after administration of the vaccine – or until April 6, 2020.

In challenging Petitioner's severity showing, Respondent correctly notes that the records reflect a six-month gap in care (between November 15, 2019, approximately six weeks post vaccination, and May 29, 2020, approximately eight months post vaccination). Motion at 5. More so, Respondent contends that the supplemental declarations submitted to remedy this deficiency "do not adequately address the six-month gap" in care, and that such assertions are not corroborated by the contemporaneous medical records. *Id.* at 5-6 (citing Ex. 19 at 2; Ex. 22 at 2; Ex. 23 at 2; Ex. 24 at 2).

But Petitioner's filed supplemental declaration (submitted after my Order to Show Cause), paired with her *original* declaration, contain some objective evidence to explain the gap in care.[7] For example, it is persuasive that Petitioner was indeed enrolled in a nursing program in another state during the relevant time period, which also required her to work on the weekends back home. *See*, e.g., Ex. 10 ¶ 11; Ex. 24 ¶¶ 6, 8. By any reasonable standard, this likely resulted in a "busy" schedule, as alleged, and made it difficult to seek ongoing treatment.

Also compelling is Petitioner's assertion in her original declaration that, based on her experience as a medical provider (nurse), she attempted to self-treat her injury after November 15, 2019, with at-home exercises and stretches. Ex. 10 ¶ 11. This assertion is supported by her statement in her supplemental declaration – wherein she explained that she thought the post-vaccination pain would eventually subside if she continued her home regimen. Ex. 24 ¶ 8. Such factors together somewhat explain Petitioner's decision to forego treatment at that time, despite ongoing pain.

---

[7] I nonetheless credit Respondent's argument that Petitioner's witness declarations (submitted following my Order to Show Cause) do not advance Petitioner's argument with respect to severity because they do not sufficiently address or describe with particularity circumstances of ongoing pain during the relevant gap in care. *See* Motion at 5-6; *see also* Exs. 19, 22-23.

Moreover, the contemporaneous medical records following the gap in care suggest the existence (albeit barely) of ongoing sequelae during the pertinent gap. For instance, Petitioner's May 29, 2020 visit note shows that she complained of "left shoulder pain on and off with lost [sic] of 3 months worsening[,]" and that she had tried home therapy without "much improvement." Ex. 4 at 48-49. Petitioner added context to the typographical error apparent from this entry in the medical records and noted that her shoulder "felt worse during the three months before [her PCP] visit on May 29, 2020" – or dating back to roughly February 2020. Ex. 24 ¶ 13. She then consistently related her ongoing pain after the gap in care to the subject vaccination. *See,* e.g., Ex. 5 at 6; Ex. 7 at 12-13. Such entries thus provide support for six-months sequelae.

Additionally, I balance the absence of record evidence showing shoulder treatment after November 15, 2019, and before May 29, 2020, with the equal absence of evidence that the injury *had* resolved. *See* Ex. 16 at 22 (recommending additional and ongoing treatment with orthopedics and/or PT following the November 15, 2019 visit). Overall, such circumstances produce at worst a "tie" in evidence that should be decided for Petitioner. *Roberts v. Sec'y of Health & Hum. Servs.*, No. 09-427V, 2013 WL 5314698, at *10 (Fed. Cl. Spec. Mstr. Aug. 29, 2013). I thus find that the severity requirement has been just barely met in Petitioner's favor.

## Conclusion and Scheduling Order

The parties are now encouraged to explore a reasonable litigative risk settlement of the claim before expending any additional resources. While Respondent's Rule 4(c) Report also describes *other* obstacles to Petitioner's ability to satisfy a Table SIRVA claim (onset and localization of pain, 42 C.F.R. §§ 100.3(c)(10)(ii) and (iii)), from my preliminary review of the record (set forth above), the record reflects that Petitioner *could* likely overcome such arguments – a fact that ought to be considered in the parties' settlement discussions. Additionally, I will note that this case features a fairly conservative treatment course and finite damages even at full value (indeed, the severity dispute only underscores the mildness of Petitioner's injury, and her ability to "live" with it for long periods of time with no treatment).

Respondent's motion to dismissed is **DENIED. In accordance with the above, by no later than Monday, June 9, 2025, the parties shall file a joint status report providing an update on the case.** The status report shall specifically confirm the date on which Petitioner conveyed, or intends to convey, her current settlement demand and supporting documentation.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>

9

Brian H. Corcoran
Chief Special Master

Case 1:21-vv-00437-UNJ   Document 45   Filed 06/12/25   Page 10 of 10

10